IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARIO SALINAS, ET AL.        \*
                                         \*
                                         \*
      v.                                \*       Civil No. – JFM-12-1973
                                         \*
COMMERCIAL INTERIORS, INC., ET AL.    \*
                                     \*\*\*\*\*\*

**OPINION**

Plaintiffs, former employees of J.I. General Contractors ("JI"), have brought this action against Commercial Interiors, Inc. ("Commercial"), under the Federal Fair Labor Standards Act.[1] Discovery has been completed, and plaintiffs and Commercial have each filed a motion for summary judgment. Commercial's motion will be granted, and plaintiffs' motion will be denied.

I.

Commercial is a construction company that does interior finishing. Commercial currently employs 60-70 drywall mechanics directly on its own staff. JI installs drywall, frames, and ceilings. Juan and Isaias Flores Ramirez are the sole owners of JI, and they manage the company, together with their two brothers who sometimes work as supervisors.

JI was a subcontractor of Commercial at the sites at which plaintiffs worked. JI has held at least twelve subcontracts with Commercial and has had one or two contracts with a company

---

[1] Plaintiffs also assert claims under the Maryland Wage and Hour Law, the Maryland Wage Payment and Collection Act, and for quantum merit. The Maryland Wage and Hour Law has the same scope, *see, e.g.*, *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001) as does the FLSA, and it therefore fails for the same reasons stated in this Opinion. Plaintiffs' claim under the Maryland Wage Payment and Collection Act fails because an overtime claim is not properly brought under that statute. *See Butler v. DirectSat USA, LLC.,* 800 F. Supp. 2d 662, 671 (D. Md. 2011). Plaintiffs' quantum merit claim fails because it is preempted by the FLSA. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 194 (4th Cir. 2007).

called P&P, a company that is now out of business.  The subcontracts between JI and Commercial were entered into by Isaias, who neither read nor wrote them.  Isaias does not read English well.

JI owns no tools and provides none to its workers.  Rather, Commercial owned and provided all tools and equipment that were used by JI workers on its job sites, except for various small tools that JI's workers owned and provided for themselves.  Commercial also provided all supplies and materials used by plaintiffs to perform their work, such as the nail studs for framing and the drywall material and insulation for installing drywall.  Commercial also provided "gang boxes" at each work site so that JI's workers could store their tools there, if they wished.  Commercial's foremen checked subcontractors' work throughout the day and, if the work was not up to Commercial's standards, Commercial immediately told the subcontractors' supervisors to fix the work.  Commercial's foremen from time to time provided instructions to JI's workers through JI's supervisors, who translated the instructions from English to Spanish, the only language spoken by many of JI's workers.  Commercial's project managers had to approve JI's work in order for JI to get paid for the work.  A superintendent of Commercial gave instructions to Juan or Isaias about how to adjust staffing levels at the job sites where JI was working.  JI did not prepare invoices for Commercial, and Commercial's project managers generally released money to JI based on how much work had been completed.

Juan and other JI supervisors wore sweatshirts bearing Commercial's logo when working on Commercial's jobs.  Plaintiffs wore hardhats and vests with Commercial's logo.  They also had identification cards, holding themselves out as Commercial employees.  According to plaintiffs, they were told that they worked for Commercial and were instructed to tell others that they worked for Commercial.

JI did not keep written records of the amount of time that its employees worked. Commercial, however, did maintain daily and weekly time records of the work performed by JI's workers. According to plaintiffs, they congregated at a 7-Eleven and were transported to the worksite by JI and were not compensated for their wait and travel time.

II.

Plaintiffs argue that based upon this evidentiary record, Commercial should be held liable for allegedly unpaid wages due to them by JI as their "statutory employer." Under the FLSA undoubtedly, plaintiffs' case is sympathetic. They apparently are members of a minority group that may have been victimized by JI and Commercial. Moreover, it may be assumed that JI (like many subcontractors) is thinly capitalized and is dependent for its business upon Commercial. Nevertheless, Commercial is entitled to the summary judgment that it seeks.

Courts have long recognized a difference between those who work for an employer and independent contractors of the employer to whom the employer does not owe duties under the FLSA. *See Schultz v. Cap. Intern. Sec., Inc.,* 466 F.3d 298 (4th Cir. 2006). This has led courts to examine the "economic realities" of the relationship between the direct employer of the worker and an alleged statutory employer to determine the issue of whether a plaintiff is an "employee" of the latter for purposes of the FLSA. As a general proposition, it cannot be disputed that general contractors, subcontractors, and sub-subcontractors are independent entities. This proposition supports that the sub-contract relationship between Commercial and JI does not make Commercial a "joint employer" of laborers who were employed by JI. *See generally Jacobson v. Comcast*, 740 F. Supp. 2d 683 (D. Md. 2010).

Plaintiffs argue, however, that the case turns upon the FLSA's definition of "employ" that "includes suffer or permit to work." 29 U.S.C. §203(g). It would appear that this argument

is contrary to years of judicial precedent that distinguish between direct employees and independent contractors in the "joint employer" analysis. Unquestionably, a person who contracts with a person who is an "independent contractor" "suffer[s] or permit[s] to work" the employees of the independent contractor.  Therefore, I find unsound plaintiffs' argument that Commercial can be deemed to be their statutory employer merely because Commercial suffered or permitted them to work.

As reflected in my opinion in *Jacobson v. Comcast*, *supra*, in my judgment a more nuanced approach is required.  I believe that a multi-factored analysis is required to answer the "statutory employer" question.  Here, the factors to be considered include:

1. Was the relationship between JI and Commercial one that traditionally has been recognized in the law?

2.  Was the amount paid by Commercial to JI pursuant to the contract between them sufficient to permit the direct employer to meet its legal obligations under the FLSA while earning a reasonable profit?

3. Did the relationship between JI and Commercial appear to be a "cozy" one, i.e, one that is virtually exclusive and shaped by things other than objective market forces?

4.  Is the alleged violation of the FLSA one of which Commercial, during the ordinary course of performance of its own duties, should have been aware?

5.  Are there other indicia that the relationship between JI and Commercial was designed to abuse the employees of the direct employer?

In this case the relationship between Commercial and JI, which the record reflects was one of a subcontractor and a sub-subcontractor, has traditionally been recognized in the law. Thus, this case is quite different from *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947),

a case heavily relied upon by plaintiffs, because in *Rutherford* the company that was found to be a statutory employer devised an unconventional and unprincipled scheme to avoid its responsibilities under the FLSA to persons working on its own assembly line. Likewise, in this case, although JI neither needed or possessed substantial capital investments, there is no evidence that Commercial paid it less than was required for JI to meet its FLSA duties while earning a reasonable profit. Similarly, there is no evidence that Commercial knew of the primary FLSA violation alleged by plaintiffs – not compensating JI employees for time they spent coming to work. As a subcontractor, Commercial is not charged with knowledge concerning the way in which employees of its sub-subcontractors chose to arrive at the worksite. Thus, this case stands in contrast to a situation in which a contractor – which necessarily oversees the work of a subcontractor – is aware that the subcontractor is (without paying overtime) making its employees stay at the work site beyond regular hours.

      Plaintiffs have presented evidence that support the third and fifth factors. JI contracted almost exclusively with Commercial, and the relationship between JI and Commercial appears to have been quite informal. Moreover, at least some of JI's employees did not speak English, as reflected by the fact that JI's supervisors had to translate what Commercial supervisors were saying. This evidence, however, gives rise only to a suspicion that Commercial was abusing its relationship with JI, and suspicion is not sufficient to withstand a summary judgment motion.

      As I indicated earlier in this Opinion, plaintiffs' case is sympathetic. However, their doctrinal analysis is faulty in that their arguments reach too far, essentially obliterating the well-established distinction between independent contractors and employees covered by the FLSA. If contractors like Commercial are to be held liable for FLSA violations committed with

subcontractors with whom they enter into a relationship, it is Congress, not the courts, that must change the rules of the game.

A separate order effecting the rulings made in this Opinion is being entered herewith.


Date:   November 17, 2014          __/s/_____
                                                  J. Frederick Motz
                                                  United States District Judge